Patrick Bearup #136226
Name and Prisoner/Booking Number

ASPC-F-Central
Place of Confinement

PO Box 8200
Mailing Address

Florence, AZ 85132
City, State, Zip Code

**(Failure to notify the Court of your change of address may result in dismissal of this action.)**

FILED ☒    LODGED ☐
RECEIVED ___    COPY ☐

AUG 0 5 2020

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY _____ DEPUTY

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

Patrick W. Bearup _____ ,
(Full Name of Plaintiff)

Plaintiff,

v.

(1) David Shinn   (official capacity) ,
(Full Name of Defendant)

(2) Jason Monson   (official capacity) ,

(3) Adam Young   (official capacity) ,

(4) _____ ,

Defendant(s).

☐ Check if there are additional Defendants and attach page 1-A listing them.

JURY TRIAL DEMANDED

CASE NO.   **CV20-01553-PHX-SPL--MHB**

(To be supplied by the Clerk)

## CIVIL RIGHTS COMPLAINT
## BY A PRISONER

☒ Original Complaint
☐ First Amended Complaint
☐ Second Amended Complaint

## A.  JURISDICTION

1. This Court has jurisdiction over this action pursuant to:
   ☒ 28 U.S.C. § 1343(a); 42 U.S.C. § 1983
   ☐ 28 U.S.C. § 1331; *Bivens v. Six Unknown Federal Narcotics Agents*, 403 U.S. 388 (1971).
   ☐ Other: _____

2. Institution/city where violation occurred: Central Unit - Florence, Arizona

**550/555**

## B. DEFENDANTS

1. Name of first Defendant: David Shinn . The first Defendant is employed as: Director of Arizona State Prison at Central Office
(Position and Title)                (Institution)

2. Name of second Defendant: Jason Monson . The second Defendant is employed as: Deputy Warden at Central Unit (Now Transferred)
(Position and Title)                (Institution)

3. Name of third Defendant: Adam Young . The third Defendant is employed as: Assistant Deputy Warden at Central Unit
(Position and Title)                (Institution)

4. Name of fourth Defendant: . The fourth Defendant is employed as: at
(Position and Title)                (Institution)

If you name more than four Defendants, answer the questions listed above for each additional Defendant on a separate page.

## C. PREVIOUS LAWSUITS

1. Have you filed any other lawsuits while you were a prisoner?  ☒ Yes  ☐ No

2. If yes, how many lawsuits have you filed? 4 . Describe the previous lawsuits:

   a. First prior lawsuit:
      1. Parties: Bearnp v. Az Dept. of Corrections
      2. Court and case number: 4:01-cv-00269-JC
      3. Result: (Was the case dismissed? Was it appealed? Is it still pending?) Released from Custody

   b. Second prior lawsuit:
      1. Parties: Bearnp v. Arpaio
      2. Court and case number: 2:06-cv-02427-FJm-MEA
      3. Result: (Was the case dismissed? Was it appealed? Is it still pending?) Dismissed

   c. Third prior lawsuit:
      1. Parties: Bearnp v. Ryan et al
      2. Court and case number: 2:15-cv-02299-DLR
      3. Result: (Was the case dismissed? Was it appealed? Is it still pending?) Settled

If you filed more than three lawsuits, answer the questions listed above for each additional lawsuit on a separate page.

2

d. Fourth Previous Lawsuit:

   1. Parties: Bearup v. Ryan et al.

   2. Case No. 2:19-cv-05828-SPL-MHB

   3. Result: Still Pending

## D. CAUSE OF ACTION

### COUNT I

1. State the constitutional or other federal civil right that was violated: Religious Land Use and Institutionalized Person Act (RLUIPA) (42 USC 2000 cc)

2. **Count I.** Identify the issue involved. Check **only one.** State additional issues in separate counts.
   - ☐ Basic necessities
   - ☐ Mail
   - ☐ Access to the court
   - ☐ Medical care
   - ☐ Disciplinary proceedings
   - ☐ Property
   - ☒ Exercise of religion
   - ☐ Retaliation
   - ☐ Excessive force by an officer
   - ☐ Threat to safety
   - ☐ Other:

3. **Supporting Facts.** State as briefly as possible the FACTS supporting Count I. Describe exactly what **each Defendant** did or did not do that violated your rights. State the facts clearly in your own words without citing legal authority or arguments.

On July 2, 2020 The Arizona Department of Corrections (ADC) issued inmate notification 20-15[1] providing notice that ADC's Kosher meal plan is being replaced with a Vegan Common Fare. On July 3, 2020 Plaintiff filed an Informal complaint to his CO III. On July 6, 2020 Plaintiff wrote a letter of demand to ADC's Attorney Joseph Dylo. On July 7, 2020 Plaintiff's CO III denied his Informal. On July 7, 2020 Plaintiff filed a formal grievance. On July 13, 2020 A.D.W. Adam Young denied Plaintiff's grievance. On July 14, 2020 Plaintiff filed an appeal to David Shinn.

Plaintiff is a Kosher observing Messianic Jewish inmate. He has been on the Kosher diet since the start of his incarceration in February 2007. With this, he has continued to be served by ADC, vegetables, fruit, dairy, and meat products. All within the guidelines of his sincerely held religious beliefs. The Defendant's move to force Plaintiff to become Vegan places a substantial burden on his ability to practice his religion. Plaintiff states that his doctrinal position is that vegetarianism is considered spiritual weakness and a doctrine of demons[2]. For Director David Shinn to force Plaintiff to become Vegan breaches the Wall of Separation of Church and State and places ADC in a position to dictate the religious observations of Plaintiff. ADC also lacks any valid security concern to place this substantial burden on Plaintiff. Instead ADC believes it can continue to violate (exhibit count 1 exhibit A, [1] exhibit count 1 exhibit B.) continued 3-1

4. **Injury.** State how you were injured by the actions or inactions of the Defendant(s).

David Shinn has forced Plaintiff to refuse his meals, as the Vegan menu violates his sincerely held religious beliefs. Defendant Shinn has also not provided proof that the new Vegan Fare is Kosher, remains Kosher, and is supervised by a Local Rabbinical Supervisor during the process of serving food to

5. **Administrative Remedies:**
   a. Are there any administrative remedies (grievance procedures or administrative appeals) available at your institution? ☒ Yes ☐ No
   b. Did you submit a request for administrative relief on Count I? ☒ Yes ☐ No
   c. Did you appeal your request for relief on Count I to the highest level? ☒ Yes ☐ No
   d. If you did not submit or appeal a request for administrative relief at any level, briefly explain why you did not.

### 3. Supporting Facts

R.L.U.I.P.A. as it chooses, hoping inmates will not litigate. Instead, Plaintiff must now refuse the Vegan meal, risk disciplinary action for not accepting the meal, and proclaim a Fast. Defendant has also failed to provide a Least Restrictive Means other than his outright ban of serving meat and dairy to Plaintiff.

### 4. Injury

Plaintiff, and now that ADC plans to serve open food items. Defendand Shinn has not shown that the kitchen is certified as Kosher to process the Vegan food without cross-contamination from non-Kosher items. Therefore, the Vegan menu violates Plaintiff's tenets of faith and injures Plaintiff's spiritual and emotional walk with God.

## COUNT II

1. State the constitutional or other federal civil right that was violated: 8th Amendment Cruel and Unusual Punishment

2. **Count II.** Identify the issue involved. **Check only one.** State additional issues in separate counts.
   - ☐ Basic necessities
   - ☐ Mail
   - ☐ Access to the court
   - ☐ Medical care
   - ☐ Disciplinary proceedings
   - ☐ Property
   - ☐ Exercise of religion
   - ☐ Retaliation
   - ☐ Excessive force by an officer
   - ☒ Threat to safety
   - ☐ Other:

3. **Supporting Facts.** State as briefly as possible the FACTS supporting Count II. Describe exactly what **each Defendant** did or did not do that violated your rights. State the facts clearly in your own words without citing legal authority or arguments.

In early April 2020, the Arizona Department of Corrections (ADC) failed to fully follow federal guidelines for the Corona Virus, and knowingly allowed staff and inmates who shed Covid-19 to infect Plaintiff with the virus. To further harm, the prison forbid inmates, in early April, from wearing masks on the yard or in the dining areas. Threatening disciplinary action against any who wore a mask. ADC even allowed kitchen workers to handle food without gloves or face masks. During this time, it was only ADC staff that could have knowingly infected Plaintiff, as ADC banned all non-ADC employees from entering Central Unit weeks before Plaintiff's exposure.

As a result of his exposure to Covid-19, Plaintiff was placed in quarantine, at Kasson mental health Maxi detention unit. Where he was denied access to legal work product, the law library, his personal property, and basic rights established by ADC policy. Plaintiff was advised by medical that he almost died from Covid-19 and had life saving measures taken for weeks in order to save his life. Plaintiff also still suffers various long-term effects from the virus, including but not limited to, memory issues, fatigue, kidney issues, and neurological issues.

Plaintiff has followed the grievance procedure in order to resolve the knowing and willing infection of himself and several others by ADC staff. He has been unable to resolve his concerns.

4. **Injury.** State how you were injured by the actions or inactions of the Defendant(s).

Plaintiff has lifelong lung, neurological, and health concerns. He was sick to the point of death. David Shinn and Jason Monson acted with callous disregard for plaintiff's life, in Plaintiff's pre and post covid exposure, by failing to act and protect him.

5. **Administrative Remedies.**
   a. Are there any administrative remedies (grievance procedures or administrative appeals) available at your institution?    ☒ Yes    ☐ No
   b. Did you submit a request for administrative relief on Count II?    ☒ Yes    ☐ No
   c. Did you appeal your request for relief on Count II to the highest level?    ☒ Yes    ☐ No
   d. If you did not submit or appeal a request for administrative relief at any level, briefly explain why you did not.

4

# COUNT III

1. State the constitutional or other federal civil right that was violated: First Amendment Free Exercise Clause and Religious Land Use and Institutionalized Person Act (RLUIPA) (42 USC 2000 cc)

2. **Count III.** Identify the issue involved. Check only one. State additional issues in separate counts.
   - ☐ Basic necessities
   - ☐ Mail
   - ☐ Access to the court
   - ☐ Medical care
   - ☐ Disciplinary proceedings
   - ☐ Property
   - ☒ Exercise of religion
   - ☐ Retaliation
   - ☐ Excessive force by an officer
   - ☐ Threat to safety
   - ☐ Other: _____

3. **Supporting Facts.** State as briefly as possible the FACTS supporting Count III. Describe exactly what each Defendant did or did not do that violated your rights. State the facts clearly in your own words without citing legal authority or arguments.

On April 3, 2020 Central Unit Medical staff told Plaintiff to submit to a T.B. test (injection under skin). Plaintiff refused and was taken to the Yard Office. At 1210 hrs. Complex Warden Jeffrey Van Winkle spoke to Plaintiff over his refusal. Plaintiff advised him of the current litigation, a pending injunction (amended later) Plaintiff's sincerely held religious belief for refusal, and an offer of a Least Restrictive means. (Blood test or X-ray). Plaintiff also advised that forcing the test will cause willful harm. All of these events were video taped. Plaintiff did apologize that Mr. Van Winkle had to be involved. Plaintiff was then advised that Mr. Van Winkle must treat me as policy says. This creates liability on the shoulders of Director David Shinn, who directs policy. Plaintiff advised Mr. Van Winkle that he would not be physically violent and that he objects to the injection and DOES NOT give them permission. At 1221 hrs Nurse Merrill injected Plaintiff's left inner forearm with an unkosher animal protein and chemical mixture against his will.
Looking at the Turner Test: 1. ADC violated neutral government interest by forcing practices outside of my religion. 2. Director Shinn provided no least restrictive means 3. A blood test cost is nominal and any ripple effect minimal. 4. There is an easy least restrictive means: The Quantiferon TB Gold Plus blood test.

4. **Injury.** State how you were injured by the actions or inactions of the Defendant(s).

Plaintiff was forcefully injected with an unkosher substance 5 days before his most Holy Week of Passover. Director David Shinn, by policy, directed me to be forcefully injected against my Sincere Held Religious beliefs.

5. **Administrative Remedies.**
   a. Are there any administrative remedies (grievance procedures or administrative appeals) available at your institution? ☒ Yes ☐ No
   b. Did you submit a request for administrative relief on Count III? ☒ Yes ☐ No
   c. Did you appeal your request for relief on Count III to the highest level? ☒ Yes ☐ No
   d. If you did not submit or appeal a request for administrative relief at any level, briefly explain why you did not. _____

If you assert more than three Counts, answer the questions listed above for each additional Count on a separate page.

5

## D. CAUSE OF ACTION

### COUNT IV

1. State the constitutional or other federal civil right that was violated: 4Th, 5th, 6th, 8th, and 14th Amendments

2. **Count IV.** Identify the issue involved. **Check only one.** State additional issues in separate counts.
   - ☐ Basic necessities
   - ☐ Mail
   - ☐ Access to the court
   - ☐ Medical care
   - ☐ Disciplinary proceedings
   - ☐ Property
   - ☐ Exercise of religion
   - ☒ Retaliation
   - ☐ Excessive force by an officer
   - ☐ Threat to safety
   - ☐ Other: _____

3. **Supporting Facts.** State as briefly as possible the FACTS supporting Count IV. Describe exactly what **each Defendant** did or did not do that violated your rights. State the facts clearly in your own words without citing legal authority or arguments.

On April 15, 2020 Plaintiff was forced to move to the Basson Mental Health Max Unit for Covid-19 Quarantine. He was not provided his property for almost three days. Upon receipt of his property, a partial inventory was provided and Plaintiff was advised that he would not receive his withheld property. Upon Plaintiff's release from Quarantine, and moved back to Central Unit, he was advised by property staff that Administration told property to do a complete inventory of Plaintiff's property. (He was the ONLY Covid-19 inmate returning with that Administrative Decree given). Upon receipt of his property, Plaintiff realized that several items of his were missing. He documented these issues and tried to resolve via grievance.

Adam Young has used property to retaliate against Plaintiff for Plaintiff's previous lawsuit against Jason Monson, Young's former superior. Plaintiff has a protected conduct by being allowed to possess property. Young desired an adverse reaction from Plaintiff by his allowing of the theft of Plaintiff's property by not requiring ADC staff to properly inventory Plaintiff's property until after the theft had occurred, and then tried to cover up the theft by claiming ADC staff did not do their job with an initial inventory, yet staff was not negligent in their actions. Young failed to have them comply with. As ADC Policy D.O. 909 clearly dictates property inventories on all moves in and out of every prison unit, Young knows this policy. There is a causal connection to Plaintiff's protected conduct, as

4. **Injury.** State how you were injured by the actions or inactions of the Defendant(s).

Plaintiff has been denied access to his personal property and legal work product by ADC staff all in an attempt to deter Plaintiff's litigation. This is one step of the campaign of harassment that Central Unit Administration has conducted since Plaintiff noticed his 1983 action CV19-05828-PHX-SPL-MHB

5. **Administrative Remedies:**
   a. Are there any administrative remedies (grievance procedures or administrative appeals) available at your institution? ☒ Yes ☐ No
   b. Did you submit a request for administrative relief on Count IV? ☒ Yes ☐ No
   c. Did you appeal your request for relief on Count I to the highest level? ☒ Yes ☐ No
   d. If you did not submit or appeal a request for administrative relief at any level, briefly explain why you did not. _____

8

## 3. Supporting Facts

Staff denied Plaintiff access to legal documents and legal boxes (property) for weeks while at Kasson Unit, and then due to Plaintiff's numerous requests for legal property, and negitive media coverage against ADC, ADW Young allowed staff or inmates to destroy, steal, remove, lose, or throw away Plaintiff's property placed in a storage area at Kasson Unit.

### - Cites -

Allen v. Thomas, 388 F.3d 147, 150 (5th Cir. 2004)

Bell v. Johnson, 308 F.3d 594, 604-05 (6th Cir. 2002)

Thomas v. Evans, 880 F.2d 1235, 1241-42 (11th Cir. 1989)

Tyler v. Carnahan 230 F.3d 1066, 1067 (8th Cir. 2000)

Morales v. Mackalm 278, F.3d 126, 132 (2d Cir. 2002)

## D. CAUSE OF ACTION

### COUNT V

1. State the constitutional or other federal civil right that was violated: <u>The Fourteenth Amendment</u> <u>Equal Protection for similarly situated inmates</u>

2. **Count V** Identify the issue involved. Check only one. State additional issues in separate counts.
   - ☐ Basic necessities
   - ☐ Mail
   - ☐ Access to the court
   - ☐ Medical care
   - ☐ Disciplinary proceedings
   - ☒ Property
   - ☐ Exercise of religion
   - ☐ Retaliation
   - ☐ Excessive force by an officer
   - ☐ Threat to safety
   - ☐ Other: _____

3. **Supporting Facts.** State as briefly as possible the FACTS supporting Count V. Describe exactly what **each Defendant** did or did not do that violated your rights. State the facts clearly in your own words without citing legal authority or arguments.

The Arizona Department of Corrections (ADC) has established policies to ensure all inmates of a class are treated equally. Specifically D.O. 909 Attachment A, which outlines the property each class member is allowed to possess and purchase.

Plaintiff is currently classified as Close Custody and is to be afforded the same treatment as other similarly situated inmates. Plaintiff is a member of a protected class of inmates (condemned Row) which ADC policy ensures he is to be afforded the same treatment as General Population inmates throughout the ADC system. The ADC Director has intentionally discriminated against Plaintiff and has intentionally treated Plaintiff differently than others without a rational basis for the difference in treatment by not allowing Plaintiff to purchase or possess tobacco products, while all other Close Custody inmates, on Close Custody yards can.

4. **Injury.** State how you were injured by the actions or inactions of the Defendant(s).
Plaintiff has been intentionally discriminated against and intentionally treated differently without a rational basis for the difference in treatment by Director Shinn

5. **Administrative Remedies:**
   a. Are there any administrative remedies (grievance procedures or administrative appeals) available at your institution? ☒ Yes ☐ No
   b. Did you submit a request for administrative relief on Count V? ☒ Yes ☐ No
   c. Did you appeal your request for relief on Count V to the highest level? ☒ Yes ☐ No
   d. If you did not submit or appeal a request for administrative relief at any level, briefly explain why you did not. _____

7

# COUNT VI

1. State the constitutional or other federal civil right that was violated: The Eighth Amendment Freedom from cruel and unusual Punishment, Fourteenth Amendment Equal Protection for similarly situated inmates

2. **Count VI.** Identify the issue involved. Check only one. State additional issues in separate counts.
   - ☐ Basic necessities
   - ☐ Mail
   - ☐ Access to the court
   - ☐ Medical care
   - ☐ Disciplinary proceedings
   - ☐ Property
   - ☐ Exercise of religion
   - ☐ Retaliation
   - ☐ Excessive force by an officer
   - ☒ Threat to safety
   - ☐ Other: _____

3. **Supporting Facts.** State as briefly as possible the FACTS supporting Count VI. Describe exactly what **each Defendant** did or did not do that violated your rights. State the facts clearly in your own words without citing legal authority or arguments.

   On July 18, 2019 Plaintiff filed an informal grievance concerning excessive in cell heat, that violated the Parson v. Ryan stipulated agreement. Plaintiff is being subjected to excessive temperatures due to a local ADC practice saying that relief will only be provided if the in pod temperature exceeds 95°F (Not in cell temperature). This local practice creates a serious deprivation that denies plaintiff, and part of his class, the minimal civilized measure of life's necessity. During the monsoon season, the in cell heat index temperature can rise above 100°F. Plaintiff takes mental health related medication, and Per Parsons v. Ryan, is to be given relief from temperatures that exceed 85°F. Due to ADC's inaction Plaintiff has physically suffered from dehydration, migraines, dizziness, nausea, and kidney issues. Jacob Monson acted with deliberate indifference when being notified of my heat related medical issues, he ignored it, and endangered my life through his grievance response to merely have maintenance monitor cooler function. Not excess temperatures or a resolution to provide relief when excessive temperatures occur.

4. **Injury.** State how you were injured by the actions or inactions of the Defendant(s).
   ADC's local policy to ignore excessive temperatures, in cell, and medication related issues allowed Jason Monson and the Director to act with deliberate indifference, they have shown callous disregard for health and safety as Plaintiff suffered through heat related side-effects, even though inmates have died from heat in ADC.

5. **Administrative Remedies.**
   a. Are there any administrative remedies (grievance procedures or administrative appeals) available at your institution? ☒ Yes  ☐ No
   b. Did you submit a request for administrative relief on Count VII? ☒ Yes  ☐ No
   c. Did you appeal your request for relief on Count VII to the highest level? ☒ Yes  ☐ No
   d. If you did not submit or appeal a request for administrative relief at any level, briefly explain why you did not. _____

# COUNT VII

1. State the constitutional or other federal civil right that was violated: The 8th Amendment Cruel and Unusual Punishment

2. Count VII, Identify the issue involved. Check only one. State additional issues in separate counts.
   ☐ Basic necessities     ☐ Mail     ☐ Access to the court     ☒ Medical care
   ☐ Disciplinary proceedings     ☐ Property     ☐ Exercise of religion     ☐ Retaliation
   ☐ Excessive force by an officer     ☐ Threat to safety     ☐ Other:

3. **Supporting Facts.** State as briefly as possible the FACTS supporting Count VII. Describe exactly what **each Defendant** did or did not do that violated your rights. State the facts clearly in your own words without citing legal authority or arguments.

Jason Monson has intentionally denied, delayed, and interfered with my access to medical treatment. Due to his involvement, Plaintiff has been subject to wanton infliction of pain and Mr. Monson's response was deliberately indifferent. Plaintiff suffers from chronic back pain due to two areas of scoliosis. Plaintiff has gone through every treatment suggested by the medical provider. The only lasting treatment occurred on December 6, 2019 when Plaintiff was sent off site for therapy. There the doctor used a T.E.N.S. unit for pain management. Prior to this on October 8, 2019 Medical Provider Marianne Powell ordered a T.E.N.S. unit for Plaintiff to use. On a follow up on November 23, 2019 Powell advised Plaintiff that she had to cancel my T.E.N.S. order, as Jason Monson would not allow me to have one. This is where Jason Monson denied my medical treatment. As the Health Services Technical Manual clearly shows, T.E.N.S. units are allowed on all prison yards. The conflict continues, as Medical states that T.E.N.S. units are not allowed because the Units Administration. Yet in a Grievance Appeal. The Director's Office clearly states they are not denying me a T.E.N.S. unit, as policy allows them. This blame shifting has caused Plaintiff to endure excessive daily pain, an inability to walk at times, an inability to work out at times, an numerous other issues that could easily be resolved with T.E.N.S. treatment.

4. **Injury.** State how you were injured by the actions or inactions of the Defendant(s).

Plaintiff suffers daily due to treatable spinal pain. Jason Monson acted with deliberate indifference as he interfered with Plaintiff's medical treatment, causing Plaintiff to remain in pain and have a condition that can worsen.

5. **Administrative Remedies.**
   a. Are there any administrative remedies (grievance procedures or administrative appeals) available at your institution?     ☒ Yes     ☐ No
   b. Did you submit a request for administrative relief on Count VII?     ☒ Yes     ☐ No
   c. Did you appeal your request for relief on Count VII to the highest level?     ☒ Yes     ☐ No
   d. If you did not submit or appeal a request for administrative relief at any level, briefly explain why you did not.

---

If you assert more than three Counts, answer the questions listed above for each additional Count on a separate page.

## E. REQUEST FOR RELIEF

State the relief you are seeking:

Plaintiff seeks compensatory and punitive damages in amount to be determined at trial, injunctive relief, and any and all other appropriate relief.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on  Aug 1, 2020
            DATE

                                         SIGNATURE OF PLAINTIFF

N/A

(Name and title of paralegal, legal assistant, or
other person who helped prepare this complaint)

N/A

(Signature of attorney, if any)

N/A

(Attorney's address & telephone number)

## ADDITIONAL PAGES

All questions must be answered concisely in the proper space on the form. If you need more space, you may attach no more than fifteen additional pages. But the form must be completely filled in to the extent applicable. If you attach additional pages, be sure to identify which section of the complaint is being continued and number all pages.

Count    1

Exhibit    A

Inmate Notice   20-15



# Arizona Department of Corrections Rehabilitation and Reentry

## Inmate Notification

| SUBJECT | ISSUED | NOTIFICATION NUMBER |
|---|---|---|
| Common Fare Meal | July 2, 2020 | 20-15 |

This information is to be posted for **a minimum of 30** days in areas accessible to inmates and shall be made available to inmates who do not have access to posted copies.

## NOTICE

Effective August 1, 2020, religious and kosher diets are being replaced with a plant based vegan common fare meal which meets religious requirements for kosher, Halal and all other religions. The common fare meal will also be offered to general population inmates upon request. Inmates requesting the common fare meal shall notify the chaplain (religious reasons) or their CO III (personal reasons) at least 30 days prior to the start of the diet. If requesting to cancel the common fare meal the inmate shall give a 30 day notice to the chaplain (religious reasons) or CO III (personal reasons) prior to the cancelation of the diet.

David Shinn
Director

Count    1

Exhibit    B

God's Food Laws

reminds Christ's disciples that He is working out God's plan of offering salvation from sin and death and the gift of eternal life in the family of God to all humanity—past, present and future.

(For more details, download or request *Holidays or Holy Days: Does It Matter Which Days We Observe?* and *God's Holy Day Plan: The Promise of Hope for All Mankind*)

# God's Food Laws

*We believe that those meats that are designated "unclean" by God in Leviticus 11 and Deuteronomy 14 are not to be eaten.*

Scripture reveals that God created the vast array of animal life that inhabits our planet and further states that some animals were created for the specific purpose of providing food for mankind (1 Timothy 4:3). Although a Christian is not obligated to eat any meats, vegetarianism in its various forms, if practiced as a matter of religious requirement, is considered to be a spiritual weakness (Romans 14:2), and trying to impose that as a teaching to others is listed as a "doctrine of demons" (1 Timothy 4:1-3).

There is no clear statement as to when God first revealed the difference between those animals that are designated "clean" in Scripture and those that are not. The absence of a clear command on this matter in the first few chapters of Genesis should not be taken as proof that no instruction was given in this regard at the beginning of human history.

There are few clear commands in the early pages of the Bible, but the examples that are recorded reveal that standards of right and wrong were clearly understood. For example, there is no clear command against murder before Cain killed his brother Abel, but no one would conclude that murder was therefore acceptable before this point.

The book of Genesis can be described as a book of beginnings. It was written or compiled by Moses to provide a historical record of what took place, not to list specific laws. Readers shouldn't assume, based on absence from the beginning of Genesis, that any law not mentioned was not in existence from the beginning.

The first statement in Scripture concerning "clean" and "unclean" animals is found in Genesis 7:2, where Noah is commanded to take seven (or, more likely, seven *pairs*) of each kind of clean animal and only one

pair of each kind of unclean animal.

When God told Noah to build a giant ark, He gave explicit instructions on its size, composition and design, yet Scripture records that God saw no need to instruct Noah about which creatures were clean and which were unclean: God's instruction and Noah's response clearly indicate that Noah already understood which creatures were clean and which were not.

At the conclusion of the great Flood, God told Noah: "Every moving thing that lives shall be food for you. I have given you all things, even as the green herbs" (Genesis 9:3). This did not mean, however, that every single animal was fit for human consumption. Many creatures by their very nature are dangerous, poisonous and place our health at risk.

The point being made here was that, even though there were few men left alive, and large and dangerous animals had been preserved, Noah and his family had no need to fear these animals. Animals, the verse makes clear, were to be for man's benefit. As a whole, they were given into man's control *in the same way the green plants were given.*

Note the parallel. Some green plants are suitable for food, some are suitable for building materials, some are for beautification and enjoyment, and some are poisonous and can sicken and bring death when ingested. In the same way, some animals are useful for providing food while others provide fibers for clothing, strength for working the land or protection from dangers. And like poisonous plants, some animals are not intended to be eaten.

Whenever animals are mentioned in Scripture as a food source or in connection with sacrifice before Israel received the Old Covenant at Mount Sinai, they are invariably animals designated as clean (Genesis 15:9—cow, goat, sheep, dove, pigeon; Genesis 22:13—sheep; Exodus 12:5—sheep or goat). The law of clean and unclean meats clearly predates the Old Covenant, regardless of what role they may have played within that covenant.

When the Levitical system was established, it was necessary to codify a number of matters that had already been in effect for some time. Two sections of Scripture, Leviticus 11 and Deuteronomy 14:3-21, codify which creatures are set apart as suitable for food and which are not. The term used to designate those animals whose flesh is acceptable for food is *clean*, while the term used for those that are not suitable for food is *unclean*. It is important that we "distinguish between the unclean and the clean" (Leviticus 11:47; compare Ezekiel 22:26; 44:23).

Scripture does not reveal exactly why God designated certain animal flesh as suitable for food while other flesh is not acceptable. There could be health reasons or symbolic reasons or, as there seems to be, both. God certainly knows why and how He created each animal. Yet even if God's determinations in this matter were purely just a test of obedience, He, as the Creator of all life, has full rights to make such decisions.

nutritious. If you are aware that a certain plant is poisonous (or not nutritious for humans), you can be assured that it was not "...created to be received with thanksgiving..."

As Dr. David H. Stern comments in his *Jewish New Testament Commentary*:

"Everything created by God is good, but not everything created by God is food. Therefore, this verse does *not* abolish the Jewish dietary laws." (p. 644)

~ Eating All Things ~

Yet another passage is sometimes used to claim all meats are now clean:

"Receive one who is weak in the faith, *but not to disputes over doubtful things. For one believes he may eat all things, but he who is weak eats only vegetables*."
(Rom. 14:1-2)

The question here is not whether one may eat unclean meats, but what to do about those vegetarians who think it is spiritually wrong to eat any kind of meat. (Notice the issue is not about being a vegetarian for heath reasons, but solely for spiritual reasons.)

One of the characteristics of pagan Gentile religions is the tendency to designate certain days for fasting or abstaining from certain types of food. This tendency can even be found within traditional Christian churches. It was not that many years ago when one major denomination required all of their adherents to eat fish rather than meat on Fridays. This type of practice is known as asceticism; abstaining from something for 'spiritual' reasons.

*Shaul*, like *Yeshua* before him, takes this opportunity to teach some important spiritual principles about not judging one another and learning how to love; thus avoiding dissension in the body of Believers:

"Let not him who eats [*clean meats*] despise him who does not eat, and let not him who does not eat [*any kind of clean meat*] judge him who eats; for God has received him. Who are you to judge another's servant? To his own master he stands or falls. Indeed, he will be made to stand, for God is able to make him stand."
(Rom. 14:3-4)

We are all servants of the Father. Therefore, since we are all fellow servants, we should not judge one another in these matters since that is God's prerogative. What we must be very careful not to do is tempt someone into doing something which they believe to be a sin, even though we understand it is not a sin. Thus, *Shaul* gives us one of the main New Testament definitions of sin:

"But he who doubts is condemned if he eats [*meat*], because *he does not eat from faith; for whatever is not from faith is sin*."
(Rom. 14:23)

Thus we see, that in the above passage, *Shaul* is talking about asceticism in the form of spiritual vegetarianism. He is not talking about meats which God declared unclean.

~ Meat Offered to Idols ~

A similar situation is found in *Shaul's* first letter to the Corinthians. Here the subject is not special days and vegetarianism, but meat that has been offered to idols and then taken to the market to be sold. Apparently, this was a common practice in pagan cities such as Corinth. Once again, there is no evidence that the text is talking about unclean animal food, but rather it is speaking of clean animal food. It merely mentions food which has been used in pagan rituals. Based on our understanding of God's law, we can assume that it is referring only to clean animal meat:

"Therefore concerning the eating of things offered to idols, we know that an idol is nothing in the world, and that *there is* no other God but one."
(I Cor. 8:4)

*Shaul* pointed out that there really is only one God and that the pagan gods are not gods at all, but merely idols of wood or stone. Even though this is true, there are Believers who would not think of touching the meat of an animal that had been offered to an idol:

"However not all men have this knowledge; but some, being accustomed to the idol until now, eat *food* as if it were sacrificed to an idol; and their conscience being weak is defiled."
(I Cor. 8:7 NAS)

Because some Believers had practiced idolatry in the past, and were offended by the eating of meat that had been offered to idols, *Shaul* once again taught the loving way to solve the problem:

"But food will not commend us to God; we are neither the worse if we do not eat, nor the better if we do eat.

"But take care that this liberty of yours does not somehow become a stumbling block to the weak. For if someone sees you, who have knowledge, dining in an idol's temple, will not his conscience, if he is weak, be strengthened to eat things sacrificed to idols? For through your knowledge he who is weak is ruined, the brother for whose sake Christ [*Messiah*] died.